IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH W. BLACK, | ) | CASE NO. 3:16CV2918 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Kenneth Black ("Black") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

On February 25, and April 15, 2014, Black protectively filed applications for SSI and DIB, respectively, alleging a disability onset date of February 24, 2012.  Tr. 238, 244.  He alleged disability based on the following: radiculopathy, degenerative arthritis, herniated disc, "slow learner can't comprehend what I read," "depression due to his mom[']s death," "blind can[']t see without glasses at all," "diabetes runs on both sides of my family (not tested for[)]," and "heart disease runs in my family (not tested yet)."  Tr. 276.  After denials by the state agency initially (Tr. 116, 117) and on reconsideration (Tr. 154, 155), Black requested an administrative

1

hearing.  Tr. 185-186.  A hearing was held before Administrative Law Judge ("ALJ") Paul Sher

on September 3, 2015.  Tr. 39-83.  In his September 24, 2015, decision (Tr. 17-32), the ALJ

determined that there are jobs that exist in the national economy that Black can perform, i.e., he

is not disabled.  Tr. 30.  Black requested review of the ALJ's decision by the Appeals Council

(Tr. 7) and, on September 30, 2016, the Appeals Council denied review, making the ALJ's

decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Black was born in 1970 and was 43 years old on his alleged onset date.  Tr. 272.  He

graduated from high school and is taking college courses online.  Tr. 46, 60.  He has held

numerous temporary jobs in the past to supplement his long-time seasonal employment working

at a traveling concession stand.  Tr. 51, 73.

### B.  Relevant Medical Evidence[1]

#### 1. School related records

On May 26, 1983, school psychologist Don Dohoney evaluated and tested Black to

determine appropriate placement and programming for him in school.  Tr. 384-385.  Black

scored a full scale IQ score of 84.  Tr. 384.  Dr. Doheney concluded that Black was in the "dull

normal range" of intellectual functioning and that his educational needs could best be met with

regular class placement with support from a learning disabilities consultant.  Tr. 385.

On March 20, 2014, Special Education Teacher Lisa Fisher responded to a request for

administrative information.  Tr. 367-368.  She wrote that, in 1986, Black had a three-year

reevaluation for IEP eligibility based on a learning disability involving reading comprehension

---

[1]  The medical evidence herein is based on the records cited by Defendant in her brief on the merits.  Plaintiff did
not provide a "Facts" section in his brief or detail the medical records, despite the Initial Order requiring him to.  See
Doc. 12, pp. 2-3.

and written expression.  Tr. 367.  She reported that Black had one class for academic support in a resource room and otherwise attended general education classes.  Tr. 367-368.

### 2. Medical records

On February 22, 2014, Black went to the emergency room at the Defiance Regional Medical Center complaining of right arm numbness and tingling for three days.  Tr. 348.  He also complained of neck pain for three days.  Tr. 348.  Upon exam, Black had normal right upper extremity range of motion and no motor or sensory deficits.  Tr. 349.  He was diagnosed with cervical radiculopathy, chest pain, and URI.  Tr. 349.  X-rays of his cervical spine showed mild disc narrowing.  Tr. 353.

On May 7, 2014, Black saw Duane Johnson, D.O., to establish primary care and to be monitored for potential heart problems based on a family history of heart issues.  Tr. 403-404.  A physical examination revealed no physical abnormalities.  Tr. 404.

On June 3, 2014, Black saw Stanislaw Dajczak, M.D., at the Defiance Orthopedic Center for an initial evaluation as a new patient.  Tr. 434.  Black reported sudden onset of neck pain in February 2014 with intermittent symptoms.  Tr. 434.  Upon exam, he had tenderness at his cervical spine, reduced cervical range of motion, normal motor strength in his upper extremities, intact sensation, normal reflexes, and normal coordination.  Tr. 436.  Dr. Dajczak recommended physical therapy and anti-inflammatory medication.  Tr. 436.

On June 4, 2014, Black followed up with Dr. Johnson.  Tr. 406.  He reported having migraines four to five times per week.  Tr. 406.  Upon exam, he had no physical abnormalities.  Tr. 407.

On June 9, 2014, Black attended physical therapy.  Tr. 446, 465-466.  Upon exam, he had a reduced cervical range of motion and slightly reduced strength in his upper extremities (4 to 4+/5).  Tr. 446, 465-466.  His pain decreased after the session.  Tr. 465-466.

On June 12, 2014, Black saw Scott Waters, M.D., wanting to switch his primary care over from Dr. Johnson.  Tr. 429.  He wanted disability and had a "lot of problems."  Tr. 429.  He alleged that he could not work due to pain in his neck; he reported having had x-rays, which were unavailable, and he had not undergone an MRI yet.  Tr. 429.  He reported prior work at a temp service, making automotive parts for four months until the assignment was completed, and as an assistant manager for concessions for 17 years.  Tr. 429.  He quit his concession job due to back issues but felt that he could return to his prior job on a limited basis.  Tr. 429.  He reported being able to manage his own finances, pay bills and manage his home.  Tr. 429.  Upon exam, his cervical spine was non-tender and he had full range of motion but pain with rotation.  Tr. 429.  He had normal cognition, normal motor strength and a normal gait.  Tr. 430.

On June 19, 2014, Black saw James Hargar, P.A., at the Defiance Orthopedic Center.  Tr. 442-445.  He reported a 50% improvement with the anti-inflammatory medication Diclofenac.  Tr. 442.  Upon exam, he had tenderness to his cervical spine, reduced cervical range of motion, full motor strength in his upper extremities, intact sensation, and normal reflexes.  Tr. 444.

On July 10, 2014, Black returned to Hargar for a follow up regarding his cervical spine problem.  Tr. 507.  He complained of neck stiffness and pain radiating down both arms.  Tr. 507.  Upon exam, he had tenderness in his cervical spine, reduced cervical range of motion, normal motor strength in his upper extremities, intact sensation, and normal reflexes.  Tr. 509.  Hargar commented that Black went to physical therapy for two days, had a problem and did not go again.  Tr. 509.  He explained to Black that his insurance denied his MRI request because he had

not participated in physical therapy for 4-6 weeks and re-scheduled Black for physical therapy. Tr. 510.

Black attended physical therapy on several occasions between July 17 and August 20, 2014.  Tr. 474-505.  During the physical therapy sessions, Black reported improvement of his neck pain and associated radicular symptoms.  Tr. 488-489 (very minimal pain in neck, 5/10 in shoulder and 2/10 after treatment); 491 (less pain in neck and shoulders); 495 (arrived feeling well with little pain to mention in his neck and shoulders); 499 (no report of neck pain and no radicular symptoms); 502 (reported feeling better throughout the weekend with only 1/10 pain in his shoulders).

On August 21, 2014, Black returned to Hargar reporting that his pain was 1-2/10 after physical therapy and medication but that he had been involved in a recent motor vehicle accident and his pain had increased since that time.  Tr. 511.  Upon exam, Black's cervical spine was tender, he had a reduced cervical range of motion, normal motor strength in his upper extremities, intact sensation, and normal reflexes.  Tr. 513.  Hargar recommended an MRI and continued physical therapy and medication.  Tr. 514.

On September 4, 2014, Black had an MRI of his cervical spine, which revealed small osteophyte bulges approaching his C5 and C6 nerve roots.  Tr. 545-546.

Black followed up with Hargar on September 11, 2014.  Tr. 517.  Upon exam, he had tenderness to his cervical spine, reduced cervical range of motion, normal motor strength in his upper extremities, intact sensation, and normal reflexes.  Tr. 517.  Hargar recommended an epidural steroid injection in Black's cervical spine (Tr. 518), which Black received on September 22, 2014.  Tr. 541-542.

On October 23, 2014, Black saw Scott Waters, M.D.  Tr. 577.  Dr. Waters commented that Black had five weeks of physical therapy and was getting better: he had no pain or weakness in his arms and his headaches were better.  Tr. 577.  He was doing his home exercises and had not taken pain medications recently.  Tr. 577.  Upon exam, his cervical spine was non-tender, he had a full range of motion, no muscle spasms, and normal motor strength and reflexes in his extremities.  Tr. 577.  Dr. Waters stated that Black had no evidence of nerve root compression and that he did not think that Black would benefit from surgical decompression.  Tr. 578.

On October 30, 2014, Black saw Hargar and reported that the epidural steroid injection he received in his cervical spine helped for a couple of days but then his pain returned.  Tr. 519.  He also reported improvement with physical therapy.  Tr. 519.  Upon exam, he had tenderness in his cervical spine, reduced cervical range of motion, normal motor strength in his upper extremities, intact sensation, and normal reflexes.  Tr. 521-522.  Hargar recommended a consultation with a neurosurgeon.  Tr. 522.

On November 11, 2014, Black saw Robert Baker, D.O., for a neurosurgery consultation.  Tr. 524.  He reported neck pain that did not radiate and he had no numbness or tingling.  Tr. 524.  Upon exam, he had a full range of motion in his neck, a normal gait, normal muscle strength and tone, full and painless range of motion in all major muscle groups and joints, and normal neurological functioning.  Tr. 525.

On November 16, 2014, Black went to the Defiance Regional Medical Center emergency room after he fell and hit his head and his right shoulder while playing outside in a snowball fight.  Tr. 536, 538.  X-rays of his right shoulder showed degenerative changes in his AC joint.  Tr. 540.

On December 16, 2014, Black returned to Dr. Baker for a follow-up for his neck pain. Tr. 527.  He had no numbness or tingling and his pain did not radiate.  Tr. 527.  Upon exam, he had decreased range of motion in his neck, a normal gait, normal muscle strength and tone, no joint pain with range of motion and intact sensation.  Tr. 528.  Dr. Baker referred Black to physical therapy.  Tr. 529.

On January 23, 2015, the police brought Black to the Defiance Regional Medical Center emergency room after he wrote a Facebook post threatening to take all of his pills and his girlfriend called the police.  Tr. 531, 559.  He denied being suicidal and stated that he was just angry at the time.  Tr. 531.  The attending physician remarked that Black had a good sense of humor.  Tr. 531.  He was started on Prozac and discharged.  Tr. 531.

On February 20, 2015, Black went to the Maumee Valley Guidance Center and met with licensed professional clinical counselor Amber Smith.  Tr. 559.  Black explained that his fiancée was concerned about his mood the last month after Black wrote a Facebook post stating he was thinking about taking all of his pills.  Tr. 559.  He reported a history of depression since 1986, although he was never diagnosed.  Tr. 559.  He claimed to have a hairline fracture in his neck and he was unable to lift more than one pound.  Tr. 599.  Upon exam, he had linear and organized speech and intact memory.  Tr. 560.  He denied suicidal ideations, described his mood as good, and denied difficulty with activities of daily living or managing his finances and budget. Tr. 561.  He enjoyed sports and video games.  Tr. 561.

On February 26, 2015, Black returned to Smith for counseling and reported that anger was his primary concern and that he argued with his fiancée on a weekly basis.  Tr. 563.  Upon exam, he had linear and clear speech, organized thoughts, a calm mood, cooperative behavior, and he denied suicidal ideation.  Tr. 563.

The same day, Black saw Dr. Waters and complained of intermittent right lower arm numbness that started a few months prior. Tr. 575. He denied arm weakness. Tr. 575. On exam, he had a full range of motion in his neck, spine, shoulders, elbows, wrists, hips, knees and ankles and normal motor strength in his extremities. Tr. 575. Dr. Waters diagnosed him with neuropathy and commented that the sensory changes described did not correlate with MRI evidence "at all." Tr. 576. He recommended that Black undergo EMG testing. Tr. 576.

On March 4, 2015, Black saw Jarrold Gray, M.D., for pharmacological management. Tr. 564. He again stated that he had a hairline crack from his neck to his spine, he could not lift more than a pound, and his pain was rated "10 and above." Tr. 564. His primary source of pain was in his shoulder blades. Tr. 564. Upon exam, he was cooperative, had normal speech and goal directed thoughts, an "okay" mood, and a slightly irritable affect. Tr. 565. He reported that he had been taking Prozac consistently since his emergency room visit and felt that the medication helped; "it has calmed my temper down quite a bit." Tr. 565. His mood was getting better every day although he still had mood swings when someone made him angry. Tr. 565.

## C. Medical Opinion Evidence

### 1. Consultative Examiner

On April 4, 2014, Black saw consultative examining psychologist Neil Shamberg, Ph.D., in connection with his disability claim. Tr. 391-397. Black reported that the longest job he had was from June 1991 to November 2005 as a carnival concession trailer manager and that it was seasonal. Tr. 392. He alleged being very depressed since his mother died in 2003. Tr. 393. He had no computer skills or interests. Tr. 393. His driver's license had been suspended because of too many tickets so he currently did not drive. Tr. 391. Dr. Shamberg commented that, during the interview, Black appeared confused by many of the questions and he took a long time to

answer.  Tr. 393.  His thoughts and speech were logical but often disorganized and not goal directed.  Tr. 393.  Many questions had to be repeated and rephrased until he understood them. Tr. 393.  Black scored a full scale IQ score of 66.  Tr. 395.  Dr. Shamberg assessed that Black was functioning in the bottom part of the borderline range and lower than that in some other areas of cognitive functioning.  Tr. 394.  He opined that, based on Black's scores and his untreated depressive symptoms, Black would have very significant limitations in understanding, remembering and carrying out instructions; problems keeping up pace and persisting with some job tasks; minor limitations in maintaining attention and concentration; significant limitations in responding appropriately to supervisors and coworkers; and very significant limitations in responding appropriately to work pressures.  Tr. 396-397.

### 2. State Agency Reviewers

<u>Mental</u>: On April 11, 2014, state agency reviewing psychologist Aracelis Rivera, Psy.D., reviewed Black's record.  Tr. 95.  Regarding Black's mental residual functional capacity ("RFC"), Dr. Rivera opined that Black may require occasional repetition of oral instructions and should be presented with opportunities for hands-on learning; he could understand and remember one to three step tasks of a repetitive nature in a work setting where supervision is available occasionally to explain tasks and redirect; he was not well suited for work involving dealing with the public, resolving conflicts, and persuading others to follow demands; he retained the capacity for brief, superficial interactions with supervisors and coworkers; and he can adapt to a static work setting.  Tr. 95-96.

On October 1, 2014, state agency reviewing psychologist, Tonnie Hoyle, Psy.D., reviewed Black's file and adopted Dr. Rivera's mental RFC opinion.  Tr. 131-132.

Physical: On April 15, 2014, state agency reviewing physician Stephen Sutherland, M.D., reviewed Black's file.  Tr. 93.  Regarding his physical RFC, Dr. Sutherland opined that Black could perform light work with frequent pushing and pulling with the upper extremities due to cervical radiculopathy; could not climb ladders, ropes or scaffolds; could frequently kneel and stoop but could not crawl; could occasionally reach overhead bilaterally; and must avoid concentrated exposure to hazards.  Tr. 93-94.

On September 22, 2014, state agency reviewing physician Elizabeth Das, M.D., reviewed Black's file and opined that he could perform light work; could frequently push and pull with his upper extremities; could occasionally climb ramps and stairs; could not climb ladders, ropes or scaffolds; could occasionally crouch and stoop but could not crawl; could occasionally reach overhead bilaterally; and must avoid concentrated exposure to hazards.  Tr. 128-130.

### D.  Testimonial Evidence

#### 1.  Black's Testimony

Black was represented by counsel and testified at the administrative hearing.  Tr. 41-74. He testified that he lives in a mobile home with his girlfriend.  Tr. 43, 45.  He no longer has a driver's license.  Tr. 45.  He does not think he is able to drive any more because he is slowly going blind.  Tr. 45.  He last drove three years prior to the hearing.  Tr. 45.  His girlfriend's uncle drove him to the hearing and it took an hour and a half.  Tr. 46.

Black stated that he graduated from high school and took welding classes in high school, although he never worked as a welder.  Tr. 46.  He has a hard time reading because he has a reading disability.  Tr. 46.  He stated that he was in special education all the way through school. Tr. 47.  He can read books at the eighth or ninth grade level and he can do general math, such as

addition and subtraction.  Tr. 47.  His girlfriend is supporting him and she pays all the household bills.  Tr. 47.

Black discussed his past work: in 2013 as a press operator, where he lifted at most 75 pounds; in 2013 as a sorter, where he was on his feet all day and lifted at most 35 pounds; in 2010-2012 as a press operator and spot welder; in 2009-2010 as a trash sorter; and in 2009 he worked in shipping and receiving for about 9 months.  Tr. 48-51.  Prior to that time he worked as a pallet sorter (these weighed about 65-70 pounds), a cleaner, driving a van picking up elderly people, and at a carpet warehouse loading and unloading truckloads of carpet.  Tr. 52-53.  Most of these jobs were through a temporary agency.  Tr. 49, 52-53.  He worked for a long time as a concession worker, which was seasonal work.  Tr. 51.  He worked most of the year at the concession stand, which was a traveling job, and he worked temporary jobs in between the concession season.  Tr. 71-73.  The concession stand made french fries and Black peeled and cut potatoes, drained fryers and replaced the oil (these weighed about 50 pounds), and lifted 100-pound bags of potatoes.  Tr. 51.  He also was an assistant manager for the concession stand and he waited on customers, trained workers, and supervised the workers under him.  Tr. 51-52.  He stopped working at the travelling concession stand because his father became ill and he wanted to be there for him.  Tr. 72.

Black has not worked since February 2014.  Tr. 48.  Since then, he has applied for work through a temp agency throughout his geographical area.  Tr. 48.  On his alleged onset day, February 24, 2014, he got up and told his girlfriend that he was experiencing severe pain and numbness down his right arm and she made him go to the hospital, where they ran some tests.  Tr. 48.  The doctor that he saw there would not give him a release to go back to work because of his right shoulder, and that is why he stopped working.  Tr. 54.  He continues to have pain in his

11

right shoulder, arm, neck, and all the way down his spine.  Tr. 55.  The tingling in his arm is constant.  Tr. 55-56.  Black stated that the last doctor he saw told him that he could perform surgery but that surgery might paralyze Black.  Tr. 56.

Black testified that he has problems reaching in front of him and overhead.  Tr. 56.  He "can't really do anything" with his right hand or arm.  Tr. 56.  He can sign his name.  Tr. 56.  When asked what the most he could lift was, Black stated, "I'm not supposed to lift anything over a pound."  Tr. 56.  The ALJ remarked that he had seen in the medical records that Black had told a doctor he could not lift more than one pound but that the ALJ had not seen a record showing that a doctor told Black that he could not lift more than one pound.  Tr. 56-57.  When asked, Black's attorney agreed that she had not seen such a restriction in the record.  Tr. 57.  When asked what kind of treatment he was getting for his arm and shoulder problems, Black responded that he had previously had physical therapy, most recently more than a year before the hearing.  Tr. 58.  When asked why he had had none since then, Black stated that he has an appointment in two weeks to see his doctor and to go back to physical therapy.  Tr. 58.  The physical therapy is for his shoulder, arm and neck.  Tr. 58.  He had also had nerve blocks, but he had not had those in a year.  Tr. 58.  When asked why he had not had more nerve blocks, Black responded, "Dr. Dajczak's office said that I didn't need them [any] more."  Tr. 58.  He thinks that the only medication he had previously taken for his pain and tingling was Demerol.  Tr. 58.  He was not currently taking prescribed medication; the only thing he has been taking recently is ibuprofen.  Tr. 59.

When asked whether he could perform a job that required him to sit and not lift over one pound, Black stated that he can sit for a little bit, maybe 30 minutes, until his back hurts, and then he has to get up and try to stretch.  Tr. 57.  He can stand for about 20-25 minutes at a time.

Tr. 57.  He can walk about 1 ½ to 2 blocks before having to stop to catch his breath because he loses oxygen quickly.  Tr. 69.  His girlfriend helps him bathe him because he has slipped in the shower a few times.  Tr. 59.  He can't reach around to wash his back and he tries to use his left hand to wash his hair, but he usually can't get it all.  Tr. 59.  His girlfriend shaves him and cuts his hair.  Tr. 59-60.  He lets his girlfriend do all the grocery shopping and he does not cook at all.  Tr. 63.  When the ALJ pointed out that Black's girlfriend filled out a function report and stated that Black cooks for himself, Black stated that he can cook some things, "but it's very, very little."  Tr. 63.  He will go shopping with his girlfriend every two months or so when he wants to get out.  Tr. 64.  Otherwise, he will stay home and babysit his dogs.  Tr. 64.

Black has a computer at home and uses it to take classes for business management.  Tr. 60.  He spends about three hours a day on homework.  Tr. 60.  His homework is writing term papers, "do[ing] discussions," and taking quizzes.  Tr. 61.  He takes one class at a time and is currently in his second class.  Tr. 60-61.  He is carrying a "B" average.  Tr. 60.  He takes only one class at a time because that is how the online classes are done.  Tr. 70-71.  About three times a week for less than 30 minutes he will get on Facebook and "talk to my family."  Tr. 61.  He also plays video games.  Tr. 61.  It takes two hands to play and he can only play for about 15 minutes, at which point his arm starts bothering him and he has to put the heating pad on it.  Tr. 62.  He uses the heating pad three times a day, every day, for 25 minutes.  Tr. 62.  He also has a neck brace.  Tr. 62.

The ALJ remarked that Black had told Dr. Waters that he thought he could perform his concessions job on a limited basis and asked Black if he still believed that he could.  Tr. 66.  Black answered that he didn't know if he could do the job if he didn't have to lift the heavy bags of potatoes but that he could try to do it.  Tr. 66.  He stated that he thinks he would be prevented

from doing it because of the tingling in his arm and guessed that he would probably have to train himself to do things left-handed. Tr. 66.

Black testified that he sees a counselor about once a month. Tr. 66-67. He is taking medication that was prescribed by a psychiatrist. Tr. 67. On a typical day, Black wakes up, lets out his dogs, and goes on the computer for a few hours to do his homework. Tr. 67. He watches television and enjoys documentaries. Tr. 67-68. He also watches dramas and tries to follow them but he loses concentration easily. Tr. 68. For example, if he is doing his homework and his girlfriend asks him a question, he will lose concentration on his homework and his girlfriend will have to remind him to return to it. Tr. 68-69. Sometimes he has problems understanding what his homework assignments are; when that happens, he emails the teacher or calls his counselor on the phone. Tr. 71. This happens a couple times a week. Tr. 71. Sometimes he still doesn't understand it and his counselor will explain it again in a way that he understands it or talks to Black's girlfriend and she will explain it to him. Tr. 71.

### 2. Vocational Expert's Testimony

Vocational Expert Mr. McBee ("VE") testified at the hearing. Tr. 73-82. The ALJ discussed with the VE Black's past work as a spot welder, press operator, salvage sorter, fry cook, cleaner, and van driver. Tr. 75-76. The ALJ asked the VE to determine whether a hypothetical individual of Black's age, education and work experience could perform Black's past work or any other work if that person had the following characteristics: can perform light work; can occasionally push and pull with the upper extremities; can occasionally climb ramps and stairs but never ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch but never crawl; can occasionally reach overhead with both upper extremities; must avoid all exposure to hazards such as unprotected heights and moving machinery; can never drive

14

commercially; can perform simple, routine tasks but not at a production rate pace; can adapt to changes in a work setting that are simple, infrequent and easily explained; can make simple work-related decisions; and can frequently interact with coworkers, supervisors and the public. Tr. 76-77.  The VE answered that all past work would be eliminated but that such an individual could perform work as an office helper (54,000 national jobs), palletizer (50,000 national jobs) and photocopy machine operator (21,000 national jobs).  Tr. 77-78.  Second, the ALJ asked the VE if his answer would change if the individual would also be limited to occasionally needing reminders regarding tasks.  Tr. 78.  The VE replied that such a limitation would eliminate all work.  Tr. 78.

For his third hypothetical, the ALJ asked if the VE's answer to the first hypothetical would change if the individual was limited to occasional interaction with coworkers and supervisors, no interaction with the public and no working in tandem or in teams.  Tr. 78.  The VE answered that such an individual would still be able to perform the jobs previously identified. Tr. 78.  The ALJ asked if the individual could still perform those jobs if he would be off task 20% of the time.  Tr. 78-79.  The VE answered that such an individual could not.  Tr. 79.  The ALJ asked the VE what ordinary breaks are and the VE stated that ordinary breaks generally include a 15-minute break in the morning and afternoon and a 30-minute lunch break.  Tr. 79. The ALJ asked what the ordinary tolerance for absenteeism is and the VE stated that to miss one day per month beyond vacation or sick time allotted would subject the individual to reprimand and/or dismissal; up to 10 days absent over one year would mean likely dismissal; and that if the individual were in a 90-day probationary period, even missing one day would result in dismissal. Tr. 79.  The ALJ asked what the on-task requirement for competitive unskilled work is and the

VE answered that one is expected to be on task at least 80% of the workday, inclusive of break periods.  Tr. 79-80.

Black's attorney asked the VE whether her answer to the ALJ's first and third hypothetical would change if the individual was limited to occasional reaching, handling and fingering with the right, dominant hand and extremity.  Tr. 80.  The VE replied that such an individual would have difficulty performing the jobs previously identified.  Tr. 80.  The ALJ asked whether the individual described by Black's attorney could perform other work.  Tr. 81. The VE testified that the individual described by the ALJ in the first hypothetical with the additional limitations described by Black's attorney could perform work as a rental consultant (90,000 national jobs), counter clerk (30,000 national jobs) and usher (17,000 national jobs).  Tr. 81.  Black's attorney asked the VE if the individual described by the ALJ in the third hypothetical with the additional limitations described by Black's attorney could perform the jobs identified and the VE answered no.  Tr. 81-82.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his September 24, 2015, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 19.

2.      The claimant has not engaged in substantial gainful activity since February 24, 2014, the alleged onset date.  Tr. 19.

3.      The claimant has the following severe impairments: obesity, degenerative disc disease of the cervical spine, depressive disorder, and borderline intellectual functioning.  Tr. 19.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can: Occasionally push and pull with upper extremities; Occasionally climb ramps and stairs; Never climb ladders, ropes or scaffolds; Occasionally balance, kneel, stoop and crouch, never crawl; Occasionally reach, handle, and finger, with right dominant upper extremity; avoid all exposure to hazards such as moving machinery and unprotected heights; never drive commercially; perform simple, routine tasks but not at a production rate pace; adapt to changes in work routine that are simple and infrequent and easily explained; make simple, work-related decisions; and frequently interact with coworkers and supervisors and the public. Tr. 23.

6.      The claimant is unable to perform any past relevant work.  Tr. 30.

7.      The claimant was born on March 30, 1970 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 30.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 30.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.  Tr. 30.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 30.

11.  The claimant has not been under a disability, as defined in the Social
     Security Act, from February 24, 2014, through the date of this decision.
     Tr. 31.

## V. Plaintiff's Arguments

Black objects to the ALJ's decision on three grounds: the ALJ erred when he "rejected" consultative examiner Dr. Shamberg's opinion that Black was disabled and when he gave more deference to the state agency reviewing psychologists' opinions; the ALJ erred when he gave more weight to the opinions of the second state agency reviewing physicians and psychologists over the opinions of the first state agency reviewing physicians and psychologists; and the ALJ erred when he found Black's testimony to be inconsistent with objective medical findings.  Doc. 20, pp. 2-4.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when he assessed the opinion evidence

#### 1. Consultative Examiner Dr. Shamberg's opinion

Black argues that the ALJ erred when he "rejected" Dr. Shamberg's opinion that Black was disabled. Doc. 20, p. 2. First, Black's citation to legal authority describing the treating physician rule (Doc. 2, pp. 4-5) is irrelevant because Dr. Shamberg was not Black's treating physician and the record does not contain a treating physician opinion assessing Black's functional impairments. Second, Dr. Shamberg did not opine that Black was disabled. Instead, he detailed functional limitations in the workplace that he assessed Black to have. Tr. 396-397.

The ALJ considered Dr. Shamberg's opinion:

Dr. Shamberg opined that the claimant would not be capable of managing his funds because of his low IQ score. He also indicated that the claimant would have significant limitations in understanding, remembering, and carrying out instructions due to his low IQ and untreated major depression. Dr. Shamberg stated that the claimant had minor limitations in his ability to maintain attention and concentration. He also indicated that the claimant would have significant limitations with regard to his ability to respond appropriately to supervisors and many coworkers on some jobs due to being depressed, shy, and somewhat fearful around other people. Lastly, Dr. Shamberg opined that the claimant would have very significant limitations with regard to his ability to respond appropriately to many work pressures (Ex. 4F). The opinion of Dr. Shamberg is given some weight because it is based upon a detailed psychological evaluation. However, the WAIS performed by Dr. Shamberg showing a full scale IQ score of 66 is significantly lower than a previous Wechsler Intelligence Scale for Children (WISC) performed in 1983. In that testing, the claimant had a full scale IQ score of 84, considered low average (Ex. 3F, p. 20). There is no intervening head trauma to explain the wide discrepancy in the scores. Since the claimant did graduate high school in general education classes with only one special education course and he is now able to attend college level courses, it appears that if he has a low IQ it does not affect his abilities to the extent contemplated by Dr. Shamberg. Further, the claimant reported to Dr. Waters that he is able to manage his own finances, pay bills, and manage his home (Ex. 7F, p. 9). This combined with his history of selling concessions at traveling carnivals suggest that he has greater ability than determined by Dr. Shamberg.

Tr. 29-30.

Black argues that the ALJ erred in his analysis because he concluded that Dr. Shamberg was "fooled" by Black into assessing a lower IQ score and the ALJ wrongfully substituted his own opinion for Dr. Shamberg's opinion that Black had an IQ score of 66, including relying on Black's prior IQ test given to Black when he was a child. Doc. 20, pp. 4, 6; Doc. 22, p. 1. This

argument fails.  The ALJ did not conclude that Black "fooled" Dr. Shamberg.  Moreover, the ALJ's discussion of Black's IQ scores was not erroneous.  The ALJ did not substitute his own opinion in place of a medical opinion when he compared two conflicting IQ scores in the record. *Garner*, 745 F.2d at 387 (the ALJ resolves conflicting evidence in the record); *Robinson v. Comm'r of Soc. Sec.*, 2011 WL 3911969, at *16 (S.D.Ohio June 13, 2011) ("[I]t was the ALJ's duty to resolve the conflicting evidence to determine which IQ scores most accurately reflected plaintiff's intellectual functioning," including whether there was evidence that claimant had suffered an intervening head injury).  Furthermore, the ALJ gave a reasoned explanation for discounting the limitations assessed by Dr. Shamberg based, in part, on Black's second IQ score: Black graduated from high school taking regular classes and only one special education class; he was currently enrolled in college courses; contrary to Dr. Shamberg's express findings, Black told Dr. Waters that he is able to manage his finances, his home, and pay his bills; and Black had an extensive work history selling concessions at traveling carnivals.  Tr. 30.  Finally, the state agency reviewing psychiatrist Dr. Hoyle, whose opinion the ALJ also gave some weight to, discounted Dr. Shamberg's findings and conclusions because, in part, they were inconsistent with Dr. Water's records.  Tr. 132.  *See Courter v. Comm'r of Soc. Sec.*, 479 Fed. App'x 713, 721 (6th Cir. 2012) (the ALJ's reliance upon an expert opinion that the claimant's IQ scores were underestimated constituted substantial evidence supporting the ALJ's decision).

Black also argues that the ALJ did not comply with SSR 06-03p and 20 C.F.R. § 404.1527(d)(2) when he considered Dr. Shamberg's opinion.[3]  Doc. 20, p. 4.  Pursuant to 20 C.F.R. § 404.1527(c), the ALJ weighs medical opinion evidence that is not entitled to controlling

---

[3] Social Security Ruling 06-03p sets forth the procedure for considering opinions from sources who are not "acceptable medical sources" or decisions by other governmental or nongovernmental agencies.  2006 WL 2329939. This Ruling does not apply to Dr. Shamberg because Dr. Shamberg is an acceptable medical source hired by the Social Security Administration and not another governmental agency or a nongovernmental agency.

weight based on the following: the examining relationship; the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.  Here, the ALJ correctly identified Dr. Shamberg as a one-time examining consultant who holds a Ph.D.  Tr. 26.  As explained above, the ALJ detailed why he found Dr. Shamberg's opinion not supported and not consistent with the record as a whole.  Tr. 29-30.  Elsewhere in his decision, the ALJ outlined, in great detail, the mental impairment evidence in Black's record, including Black's complaints to providers, his provider's objective findings, his lack of treatment prior to his disability application, his hospital visit and subsequent Prozac prescription and his diagnosis of depressive disorder, NOS.  Tr. 27.  The ALJ remarked that Black was taking and had completed online business management courses at the college level, which is inconsistent with Black's report that he had no computer skills, needed help reading big words, and has difficulty filling out forms.  Tr. 28.  Finally, the ALJ discussed the opinions of the state agency reviewing psychologists.  Tr. 29.  In sum, the ALJ complied with the requirements for considering opinion evidence.  20 C.F.R. § 404.1527(c).  He committed no error when he assessed Dr. Shamberg's opinion.

## 2. State Agency Reviewing Psychologists and Physicians

Black argues that the ALJ erred because he gave more deference to the state agency reviewing psychologists' opinions than Dr. Shamberg's opinion.  Black's argument lacks merit because the ALJ gave all opinions "some" weight and, therefore, did not defer to one more than the other.

### a. Psychologists' opinions

Black also asserts that the ALJ erred when he gave more weight to the opinion of the second state agency reviewing psychologist, Dr. Hoyle, over the first state agency reviewing

psychologist, Dr. Rivera.  Doc. 20, p. 3; Doc. 22, p. 1.  The only notable difference found by the

ALJ between the two opinions is that Dr. Hoyle found Black to have mild restrictions in

activities of daily living and Dr. Rivera found Black to have moderate restrictions in activities of

daily living.  Tr. 29.  Elsewhere in his decision, the ALJ explained why he found Black to have

only mild restrictions in activities of daily living.  Tr. 21, 28.  Black does not challenge this or

any other finding by the ALJ with respect his mental limitations.  Any purported argument not

fully explained is deemed waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.

1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed

argumentation, are deemed waived.  It is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal

citations omitted).

### b. Physician's opinions

Black argues that the ALJ erred because he gave "some" weight to the first state agency

reviewing physician, Dr. Sutherland, and more ("significant" weight) to the second state agency

reviewing physician, Dr. Das.  Doc. 20, p. 3; Doc. 22, p. 1.  It is not entirely clear to the

undersigned why Black is challenging the ALJ's treatment of these opinions for two reasons.

First, Dr. Das's opinion was slightly more restrictive than Dr. Sutherland's opinion.  See Tr. 93

(Dr. Sutherland's opinion limiting Black to frequent stooping and kneeling and unlimited

crouching and climbing of ramps/stairs); Tr. 128 (Dr. Das's opinion limiting Black to occasional

climbing of ramps/stairs, occasional stooping and crouching, and unlimited kneeling).  Thus,

Black should not find it objectionable that the ALJ gave more weight to the opinion that found

him to be more limited.  Second, the ALJ's RFC incorporated the most limiting instructions of

both opinions (and added some additional limitations).  Nevertheless, the undersigned will consider Black's argument with respect to the ALJ's treatment of these opinions.

The ALJ explained why he gave more weight to Dr. Das's opinion than Dr. Sutherland's opinion and Black does not object to these findings.  He only argues that Dr. Das relied on an updated record but the ALJ did not refer to these updated records in his decision.  Doc. 20, p. 3.  This is incorrect.  The ALJ discussed at length numerous records dated after Dr. Sutherland's opinion (April 15, 2014) and before Dr. Das's opinion (September 22, 2014).  See Tr. 24 (citing Dr. Johnson's treatment notes from May 7 and June 4, 2014, and Dr. Dajczak's treatment note from June 3, 2014); Tr. 25 (citing physical therapy notes from June 9, 10, and July 17, 2014; Dr. Water's treatment note from June 12, 2017; Dr. Dajczak's treatment note from July 10 and August 21, 2014); Tr. 26 (citing cervical spine MRI dated September 4, 2014, and a follow-up appointment with Dr. Dajczak on September 11, 2014).  The ALJ also discussed treatment notes dated after Dr. Das's opinion.  Tr. 26.  And, as noted above, the ALJ's consideration of the entire record led him to find that Black was more limited than either Drs. Sutherland or Das found.

For all these reasons, Black's challenge to the ALJ's treatment of the state agency reviewing psychologists and physicians' opinions fails.

**B. The ALJ explained his reasons for discounting Black's testimony**

Black argues that the ALJ erred when he found that Black's testimony was inconsistent with objective medical findings and Dr. Johnson's diagnoses of degenerative disc disease and degenerative arthritis with radiculopathy.  Doc. 20, p. 2.  Black does not describe what portion of his testimony he believes the ALJ erroneously discounted.

First, Dr. Johnson did not diagnose Black with degenerative disc disease and degenerative arthritis with radiculopathy.  Rather, Black reported to Dr. Johnson, at his first visit

24

with him to establish care, that he had a history of degenerative disc disease and degenerative arthritis with radiculopathy, as the ALJ observed.  Tr. 24, 403.

The ALJ recited the objective evidence of record: an MRI showing that Black had osteophyte bulges and minimal degenerative changes in his cervical spine (Tr. 26) and mostly normal or slightly abnormal exam findings throughout his treatment history.  Tr. 24-26.  The ALJ remarked that Black's providers had recommended and continued to recommend conservative treatment (physical therapy and non-narcotic pain medication) and that physical therapy improved his neck pain.  Tr. 27-28.  He cited evidence showing that Black had participated in a snowball fight in November 2014.  Tr. 28.  The ALJ reasoned that the evidence of record "clearly" did not support Black's allegation that he could only lift one pound.  Tr. 27.  The ALJ also remarked that there was no evidence in the record to support Black's assertion that he had a hairline fracture in his spine, as he had previously reported to his counselor.  Tr. 27.

In sum, the ALJ did not err when he discounted Black's alleged limitations based on the objective medical evidence, the conservative treatment that was recommended, the conservative treatment that provided relief, and the other evidence directly contrary to Black's alleged limitations.  See SSR 96-7p, 1996 WL 374186, at *3 (credibility analysis should include consideration of, among other things, the objective medical record, the claimant's daily activities, the effectiveness of medication, and treatment received).[4]

---

[4]  SSR 16-3p, with an effective date of March 28, 2016, superseded SSR 96-7p.  2016 WL 1119029 (March 16, 2016); 2016 WL 1237954 (March 24, 2016).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: December 20, 2017

Kathleen B. Burke
United States Magistrate Judge

## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).